IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| MATTHEW BECKER, | 1:16-cv-00049-RGE-HCA |
| Plaintiff(s), | |
| vs. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | REPORT AND RECOMMENDATION |
| Defendant(s). | |

Plaintiff Matthew Becker seeks review of a final decision of the Commissioner of the

Social Security administration ("Commissioner") denying his claim for Supplemental Security

Income Benefits ("SSI") under Title XVI of the Social Security Act 42 U.S.C. § 1381-1385. This

Court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 1383(c)(3). The case is

before the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The

Court considers the matter fully submitted on the briefs.

## I.

## PRIOR PROCEEDINGS

Becker protectively filed his SSI benefits claim on February 1, 2014 alleging disability

since January 4, 2010. (AR at32,180).[2] He alleged oppositional defiant disorder, "social disorder,"

---

[1] Nancy A. Berryhill, became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), she is substituted for Carolyn Colvin as Defendant in this suit, which may continue without further action. *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2] All citations are to the administrative record. The ALJ records the filing date as February 10, 2014 (AR at 13, 73, 166), but this is contrary to the February 1, 2014 date noted in the Disability

anxiety disorder and depression limited his ability to work. (AR at 73, 184). The Social Security Administration denied Becker's claim initially and on reconsideration. (AR at 72-83, 84-96). On July 21, 2014, Becker requested an administrative hearing. Administrative Law Judge ("ALJ") David Buell conducted an administrative hearing on November 9, 2015. Becker appeared with his attorney Gregory Peterson; Becker's mother, Christine Becker, and vocational expert Stephen Schill also testified. At hearing, counsel amended the alleged onset date to February 1, 2014. (AR at 13, 32). The ALJ issued an unfavorable decision on December 18, 2015, finding Becker was not disabled. (AR at 10-26). Becker requested a review of the ALJ's decision. (AR at 8-9). The Appeals Council denied the request for review and the ALJ's decision became a final decision on November 4, 2016. (AR at 1-3). The Complaint [1] in this case was timely filed on December 23, 2016.

### A.    Educational and Vocational Factors

Becker was 18 years old when he filed for benefits. (AR at 166). He had limited past work as cook/counter attendant at a fast food restaurant and housekeeping at a hotel. (AR at 34-37). Becker completed the eleventh grade in high school. (AR at185).

### B.    Medical Evidence

Becker's mental health medical history begins with an admission to Mercy Hospital in Council Bluffs, Iowa on May 27, 2010, when he became suicidal after breaking up with his girlfriend. He told his counselor[3] he was thinking about killing himself and would not contract for safety. (AR at 279, 283). He was hospitalized until May 30, 2010. (AR at 279) Attending physician Dr. S. Ravipati stated that Becker participated in individual and group therapy on the unit, followed

---

Report (AR at 180). Whether the date is February 1, 2014, or February 10, 2014, is immaterial to the undersigned's report and recommendations.

[3] There are no records concerning this counseling relationship in the record.

rules and regulations, learned some coping skills and denied any suicidal or homicidal ideation on discharge. Dr. Ravipati diagnosed Becker with major depressive disorder current episode and a GAF of 50. The hospital discharged Becker to the custody of his parents with a prescription for Prozac. (*Id.*)

Becker was readmitted to Mercy Hospital on July 24, 2011, after an episode at home during which he became "very violent, very aggressive, very demanding." (AR at 295). On intake, his parents reported he had been forcing them to give him money so he could buy cigarettes. (*Id.* at 299). Becker admitted he had been buying drugs, using marijuana and alcohol, and reported a history of burning and cutting himself. (*Id.*) On mental status exam Becker was appropriately dressed and groomed, was compliant, cooperative and responsive to the interview process. (*Id.* at 300). His mood was irritable, affect "very testy, very demanding" and threatening. (*Id.*) He denied auditory or visual hallucinations and delusions, but admitted he was "explosive and very impulsive." (*Id.*) Becker's "stream of mental activity" was "goal directed" and appropriate; he was alert and oriented to time, place and person, but his impulse control relatively poor and insight and judgment fair to poor. His medications on admission included Prozac and Abilify which Dr. Ravipati discontinued. (*Id.*) During his hospitalization, which lasted until July 29, 2011, Becker was started on Trileptal and Risperidone. (*Id.* at 295). Becker had a court hearing during his hospitalization and it was recommended that he be committed and follow through with outpatient psychiatric care and treatment. (*Id.*) At discharge Dr. Ravipati diagnosed him with attention deficient hyperactivity disorder (ADHD), mood disorder not otherwise specified, oppositional defiant disorder, and marijuana dependency with a GAF at 50. (*Id.*)

Karen Rodriguez, LISW, LCSW, conducted a Diagnostic Clinical Interview with Becker on August 18, 2011. (AR at 306-309). Becker admitted he was self-medicating with marijuana and

had started stealing to support his habit. (*Id.* at 307). On mental status exam, Becker was unkempt, but alert and oriented x4. (*Id.*) His attitude was irritable and eye contact poor. (*Id.* at 308). His motor behavior was normal and his speech minimally responsive with average vocabulary. (*Id.*) Becker's thought process was logical and goal-directed, his thought content age-appropriate. (*Id.*) His perception was normal; he denied suicidal or homicidal intent. (*Id.*) Becker's mood was depressed and irritable, but his affect appropriate, with poor insight and judgment. (*Id.*) Ms. Rodriguez diagnosed mood disorder NOS, oppositional defiant disorder and ADHD by history and wanted to rule out borderline personality disorder. (*Id.*) She assessed his GAF at 50. (*Id.*) Ms. Rodriguez believed Becker was in need of "extensive therapy" and he agreed to participate in outpatient therapy. He feared being removed from home and placed at Orchard Place. (*Id.* at 309). Ms. Rodriguez noted in her prognosis/discharge criteria and aftercare plan:

> Matt is a very troubled young man and has a great deal of anger. He appears to be an over-indulged child, as evidenced by the fact that his mother answered many questions for him and did not appear to be interested in pushing Matt for fear of him becoming angry. Matt has agreed to participate in the therapeutic process, however; it appears to be coheresed [sic]. If Matt is not engaged in therapy for the sake of improving his level of functioning, his prognosis is guarded at best.

(*Id.*)

Becker treated for a time with Alegent Health Psychiatric Associates, starting on August 18, 2011. (AR at 313-318). The notes are handwritten but it appears Becker was seen on five occasions through May 10, 2012, during which his mood/affect remained consistently irritable and angry, although he reported on occasion he was doing well. (*Id.* at 314, 317).

There is a gap in Becker's treatment history until October 30, 2013, when he began seeing Patrick Pucelik, ARNP, at Myrtue Medical Center. (AR at 323). On that occasion he was brought in by his mother to discuss anxiety, which he reported occurred a few times a week. (*Id.*) Mr. Pucelik noted Becker's mother answered most of the questions because Becker said he was not

comfortable answering them. Mr. Pucelik could not get him to engage. Becker had dropped out of high school and was working on his GED. He was not employed. He could not describe his typical day to Mr. Pucelik. (*Id.*) He had seen a Dr. Armbruster and been started on Clonazepam, which he thought was helping. He admitted smoking marijuana. (*Id.*) Mr. Pucelik was told Becker had been admitted two times for psychiatric issues. They discussed seeing a psychiatrist and doing labs but Becker was not interested in either, just wanted to take Clonazepam. A prescription was given and he was to follow up in a few weeks. (*Id.*)

On November 13, 2013, Becker returned to see Mr. Pucelik. (AR at 324). His mother was not present. Becker told Mr. Pucelik he did not think the Clonazepam worked and never did, just agreed with his mother. (*Id.*) Mr. Pucelik spent 45 minutes talking with Becker, who was noted to be "very withdrawn and hard to get information from." (*Id.*) He told Mr. Pucelik none of the medication he had been on ever helped and he just wanted to be left alone, stating "nobody listens to me" during the visit. Becker was not working on his GED anymore and had been doing it to please his mother. (*Id.*) Becker reported that his mother had left him a note to ask Mr. Pucelik about Lexapro but Becker did not want the medication. (*Id.*) Becker cried a few times during their interview, recognized he was withdrawn, and wanted people to leave him alone. He wanted to take Xanax instead of Clonazepam as one of his mother's friends had given him a few. Mr. Pucelik had reservations about changing Becker's medications and wanted to refer him to someone else, but Becker did not want to see any more therapists or psychiatrists. (*Id.*) His prescription for Clonazepam was continued. (*Id.*)

At his one month follow-up on December 11, 2013, Becker reported he thought his medication was helping and he was a little more interactive. (AR at 325). Mr. Pucelik observed him to be calmer. (*Id.*)

On January 9, 2014, at a monthly check Becker reported he was doing well and had a good Christmas. (AR at 326). He was taking his medications although he said he was not sure he noticed a difference. Becker smiled and laughed during the visit and said his anger was day by day. Mr. Pucelik planned to continue his medications and follow up in a month. (*Id.*)

At a visit on February 13, 2014, Becker told Mr. Pucelik he was doing well and had no concerns. (AR at 327). Mr. Pucelik observed Becker had better eye contact but was still very non-verbal. He was groomed and well dressed and had his hood down instead of over his head as on previous occasions. (*Id.*) Becker reported he was taking his medications as prescribed. Mr. Pucelik provided a refill of his prescription. (*Id.*)

On March 12, 2014, when Becker reported for a medication check, he told Mr. Pucelik he was doing well and had no concerns. (AR at 328). Mr. Pucelik tried to engage him in conversation but got "[m]any yes no answers. Not as irritable as in the past but still not forthcoming with discussion." (*Id.*)

At a visit with Mr. Pucelik on April 9, 2014, Becker was noted to be more "interactive" than he had been. (AR at 350). Becker reported he was looking for a job. He was not interested in restarting his GED studies. He had not done much with making candles and tried selling them locally without much success. They discussed other job options. Becker said he felt the medications were working. (*Id.*)

On May 8, 2014, Becker met with Mr. Pucelik for routine medication management. (AR at 351). He said he was doing well and had no concerns. Mr. Pucelik noted Becker had been stable on his current medications. They discussed going to every other month visits, to which Becker agreed. (*Id.*)

Becker returned to see Mr. Pucelik on July 9, 2014, for routine medication management. (AR at 379). He reported he was getting along well and Mr. Pucelik observed Becker was interactive with the examination. (*Id.*) Becker said he was thinking about going to therapy in Council Bluffs and Mr. Pucelik encouraged him in that regard. (*Id.* at 380).

At a visit on September 10, 2014, Becker said he was doing good. (AR at 381). Becker reported that his mother wanted him to ask about Lexapro but he was not interested in the medication. Becker again made a comment about seeing a therapist but was no longer interested. (*Id.*)

On November 6, 2014, Becker appeared for a medication check. (AR at 382). He was getting along well. At this visit he said he was not interested in seeing a counselor or starting new medications as the current medications were working fine. (*Id.*) His only concern was night sweats he was experiencing many nights a week. Mr. Pucelik offered lab draws and workup but Becker declined. (*Id.*)

At a two-month medication check on January 7, 2015, Becker said he was doing good and had an "ok" Christmas. (AR at 383). He again declined a counselor and did not want to see anyone or try anything different. (*Id.* at 384).

On March 6, 2015, Becker told Mr. Pucelik he was doing well, had a new girlfriend, and things were going well. (AR at 385). He was frustrated on this occasion because he had to wait and was going to be late for another appointment. His hood was on but not pulled completely over his head. They again discussed Becker getting counseling but he declined. Mr. Pucelik observed Becker's birthday was approaching and he had a "self imposed deadline of having a job by" that time, which Mr. Pucelik thought was affecting his attitude on this occasion. (*Id.*)

At a visit on May 4, 2015, Becker said he was living in Omaha with his girlfriend and the relationship was going well. (AR at 386). Mr. Pucelik observed Becker was more interactive and smiled a few times. Becker needed a letter in support of his application for social security disability. He gave Mr. Pucelik verbal consent to talk with his parents. (*Id.*)

On July 6, 2015, Mr. Pucelik observed Becker was pleasant and cooperative during his interview, with good hygiene. (AR at 387). He told Mr. Pucelik he was doing good. His medications were discussed and refilled. (*Id.*)

### C.     Medical Source Opinions/Evaluations

#### 1.     Dr. Jones-Thurman

Rosanna M. Jones-Thurman, Ph.D., a licensed clinical psychologist, undertook a psychological evaluation of Matthew Becker on April 23, 2014, at the request of the Disability Determination Services Bureau of Iowa.  (AR at 336-340). Dr. Jones-Thurman took a complete demographic and family history; asked about Becker's education, family dynamics and employment; asked about medical and addiction issues, and Becker's mental health history. (*Id.* at 337). At that time Becker reported he had treated with Karen Rodriguez in Avoca, Iowa; Christine Schwery in Harlan, Iowa; and Dr. Matthew Eggers in Harlan, Iowa. (*Id.* at 338). He described his symptoms as not being happy, he could not be around people and did not talk to people; when he went out in public he got nervous and anxious. He also stated he did leave the house and would go to Walmart or pick up his girlfriend. He did not like to be at home and would leave and drive around. (*Id.*) Becker did not think his medications were helping and he had lost weight. (*Id.*) He reported he got angry easily, yelled a lot and would say things in public. (*Id.*) He said he kept to himself but was argumentative at home. He said he had problems with attention, concentration, and distraction but denied being hyper or fidgety. Becker denied panic attacks but his mother

reported he would panic and shake. (*Id.*) His mother also reported he did not process emotion, worried all the time, liked the same routine, and did not like change. Becker said he did not like loud noises but had no other sensory integration problems. (*Id.*)

With respect to his activities of daily living, Becker reported he got on the computer, read email, took care of his hygiene daily, did cooking, cleaning, laundry, ran errands and drove around. (AR at 338). He did not like being at home but said he was unable to be around other people. (*Id.* at 339). He liked to make candles and watch movies. He did not know if he could manage money. (*Id.*)

On mental status exam, Becker was neat in appearance and well groomed. (AR at 339). His behavior during the interview was appropriate; he was open and cooperative. Becker's speech was within normal range and easily understood; it was normal for volume, rate and tone. He was oriented to time, place and person; could state the date and where he was; his memory, concentration and attention were intact. His thought organization was coherent and logical; he denied thought process distortion and appeared to be of average intellectual ability. (*Id.*) Dr. Jones-Thurman believed Becker was "possibly demonstrating a mood disturbance" based on his flat mood and report of vegetative signs of depression such as sleep and appetite disturbance. He did not appear to be a risk of danger to himself or others. (*Id.*)

Dr. Jones-Thurman concluded that based on her examination Becker "would be able to remember and understand instructions, procedures, and locations and could carry those out and maintain attention, concentration, and pace." (AR at 339-340). She thought he might have "some difficulty using fair judgment and responding to changes in the work place." (*Id.* at 340). She "imagine[d]" he would have "some difficulty getting along with others." (*Id.*) Her diagnostic impression was dysthymic disorder, rule out bipolar disorder, attention deficit hyperactivity

disorder, combined type, moderate, generalized anxiety disorder, social anxiety disorder, and cannabis dependence (although he alleged remission and sobriety). (*Id.*) Her Axis II diagnosis was schizoid and avoidant personality traits; she assessed his GAF at 50. (*Id.*)

2.    Amy Riessland, LISW

In a statement dated July 3, 2014, Amy Riessland, LISW, at the Center for Healing and Hope stated she evaluated Becker on July 1, 2014. (AR at 356). At that time he was well groomed but had "very poor eye contact" and he was "disengaged in the conversation." (*Id.*) She observed he appeared "very anxious and agitated" and looked down most of the interview. (*Id.*) Both Becker and his mother were present and they both reported it was difficult to get Becker to attend the meeting because of his struggle to talk to people and his anxiety. They reported his anxiety often presented in verbal aggression towards others, which occurred at the interview in response to discussion about setting up future appointments and goals. (*Id.*) Becker and his mother reported he obsessed about his future, was depressed and hopeless. (*Id.*) Ms. Riessland stated Becker appeared to understand instructions but during the interview his immediate past recall was not good. Ms. Riessland opined that based on the intake information Becker would "struggle to carry out instructions, maintain attention, concentration and pace . . . to interact appropriately with supervisors, co-workers and especially the public due to his extreme social anxiety." (*Id.*) Based on his report about extreme anxiety in response to any change, Ms. Riessland believed "he would not be able to use good judgment and respond appropriately to change in the workplace." (*Id.*) He did appear to have average intelligence and she "did not see a reason" why he could not manage any benefits he received. (*Id.*)

### 3. Patrick Pucelik, ARNP

Mr. Pucelik offered two statements regarding his treatment of Becker. The first was dated May 5, 2015. Mr. Pucelik briefly stated he had been caring for Becker since October 2013 for social anxiety disorder, anxiety and depression. (AR at 362). He seemed to be stable at the time of the statement. (*Id.*) Mr. Pucelik gave the opinion that Becker would not be "able to hold or maintain a job given the amount of anxiety he has when in a public setting." (*Id.*)

In a second statement dated September 29, 2015, Mr. Pucelik stated he had treated Becker for about three years, during which his condition "waxed and waned." (AR at 363). He noted that in the past few months Becker seemed to be in a better place, having met a girl and moved to Omaha with her, as well as living in Pennsylvania with her and another friend. (*Id.*) Becker told Mr. Pucelik he had some anxiety in both places but was able to manage. (*Id.*) Mr. Pucelik was hopeful Becker would get out and be more involved but cautioned about "doing too much, too fast." (*Id.*) He noted Becker had not seen a psychiatrist for a "number of years" and was resistant to seeing one, which Mr. Pucelik related to "past exposure to the mental health community." (*Id.*) Mr. Pucelik believed it would be "detrimental to force him to see someone now." (*Id.*) Mr. Pucelik believed Becker was "disabled by his social anxiety, general anxiety and general depression" but hopeful that he could "work with these disabilities and obtain employment," although not at the time of his report. (*Id.*)

### 4. Beverly A. Doyle, Ph.D.

Beverly A. Doyle, Ph.D., licensed psychologist, performed a mental status exam on Becker on October 12, 2015, at the request of Disability Consultants, Becker's attorney. (AR at 392-93). Dr. Doyle noted Becker was driven to the evaluation by his mother. He was cooperative, open and honest, and provided information to the best of his recollection. (*Id.*) Dr. Doyle reviewed his

personal, educational, and work history as reported by Becker. (*Id.*) She reviewed the history of his present illness with Becker and his mother and referred to records from Mr. Pucelik. (*Id.* at 392-393). On examination, Becker was orientated and understood why he was being evaluated. He remembered general events in his mental health treatment history but not the exact sequence, who he saw, or what diagnoses were made or medications given. (*Id.* at 393). Becker reported he was living with his girlfriend in Omaha and tried a move to Pennsylvania. He described his mental health problems as including feeling sad and panic attacks, about twice a week. (*Id.*) During his panic attacks, Becker said he could not breathe and hyperventilated. He would call his mother to calm down. (*Id.*) Becker said "[h]is anxiety affected his ability to apply for jobs or go out." (*Id.*) He told Dr. Doyle he played video games with a few friends and watched TV. (*Id.*) Dr. Doyle made a diagnosis of major depressive disorder, recurrent–severe and panic disorder. (*Id.*) She stated his disorder caused "him to be unable to complete his education, work and live independently. He is unable to manage his funds and engage in daily activities including housekeeping, shopping and cooking." She opined that his prognosis was poor. (*Id.*)

In a follow-up to this report, Dr. Doyle filled out a Mental Residual Functional Capacity Questionnaire. (AR at 397-404). Dr. Doyle identified Becker's signs and symptoms as including sleep and mood disturbance; emotional lability; recurrent panic attacks; psychomotor agitation or retardation; feelings of guilt/worthlessness; difficulty thinking or concentrating; suicidal ideation or attempts; oddities of thought, perception, speech, or behavior; social withdrawal or isolation; persistent irrational fears; and generalized persistent anxiety. (*Id.* at 397). Her clinical findings were that Becker had recurrent panic attacks and severe depression. (*Id.*) Dr. Doyle indicated Becker had been hospitalized, treated with medications and given therapy but had not improved. She did not believe he was a malingerer. (*Id.* at 398). She expected his impairments to last at least

twelve months. With respect to whether his psychiatric condition exacerbated his experience of pain or other physical symptom, Dr. Doyle said he had panic attacks and could not function. (*Id.*) He did not have a low I.Q. She anticipated his impairment would cause him to be absent from work more than three times a month. (*Id.*)

With respect to Becker's mental abilities and aptitudes needed to do unskilled work, Dr. Doyle rated his ability to remember work-like procedures, understand and remember and carry out very short and simple instructions as unlimited or very good; sustain an ordinary routine without special supervision and make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions as good; and his ability to maintain attention for two hour segments as fair; and as poor or none his ability to maintain regular attendance and be punctual within customary, usually strict tolerances or to work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes, respond appropriate to changes in a routine work setting, and deal with normal work stress. (AR at 399).

With respect to Becker's mental abilities and aptitudes needed to do semiskilled and skilled work, Dr. Doyle rated his ability to understand and remember detailed instructions and carry out detailed instructions as good; to set realistic goals or make plans independently of others as fair; and to deal with stress of semiskilled and skilled work as poor or none. (AR at 400). In support of

the fair and poor ratings, Dr. Doyle said Becker had issues with depression and anxiety and may need intervention when panic attacks occurred. (*Id.*)

With respect to Becker's mental abilities and aptitudes needed to do particular types of jobs, Dr. Doyle rated his ability to interact appropriately with the general public and to adhere to basic standards of neatness and cleanliness as good; to maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation as poor or none. (AR at 401). Dr. Doyle based her ratings on Becker's panic attacks as affecting his ability to be appropriate. (*Id.*)

In terms of restrictions on his functional limitations resulting from his mental impairment, Dr. Doyle rated Becker's restriction of activities of daily living as moderate; and difficulties in maintaining social functioning, deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere), and episodes of deterioration or decompensation in work or work-like setting causing the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (including deterioration of adaptive behaviors) as extreme. (AR at 402).

Dr. Doyle indicated Becker was capable of managing disability benefits, that the nature and severity of his mental illness limited his ability to use good judgment regarding compliance with medications or medical treatment, and he would have serious mental symptomatology absent alcohol or illegal drug use. (AR at 403). She agreed his impairments were reasonably consistent with the symptoms and functional limitations in the evaluation. (*Id.*) Dr. Doyle described no other limitations that would affect Becker's ability to work at a regular job on a sustained basis. (*Id.* at 404).

5.      State Agency Consultants

On May 20, 2014, Dr. Aaron Quinn, Ph.D., performed an evaluation at the initial review level based on the records provided to the state agency. (AR at 73-81). Dr. Quinn had access to records from McDermott Hospital (which are not in the present record), Dr. Jones-Thurman (AR at 336-340, 6F), Healthy Homes Family Services, (AR at 306-309, 2F), Shelby Medical Clinic (which are not in the present record), Myrtue Memorial Behavior Health (AR at 323-328, 4F), Alegent Psychiatric Associates (AR at 313-318, 3F), a Function Report – Adult – Third Party from Kristine Becker (AR at 196-203, 3E) and a Function Report – Adult from Becker (AR 15 206-213, 4E). Based on his review, Dr. Quinn found Becker had "the medically determinable impairments of ADHD; depression, dysthymic disorder; mood disorder NOS; anxiety; social anxiety disorder; GAD; agoraphobia; ODD; schizoid and avoidant personality traits; and marijuana dependence." (AR at 80). He noted Becker's history of hospitalizations and that recent evidence showed he had "been minimally interactive," was not interested in mental health referrals and reported improvements on clonazepam. (*Id.*) He noted Becker's history of marijuana dependence and his report to his primary care provider of use in 2013. Dr. Quinn referenced Dr. Jones-Thurman's consultative examination in April 2014 in which Becker reported he had difficulties being around others, had depression and anxiety for which he took clonazepam, and reported quitting marijuana a year before. (*Id.*) Dr. Quinn noted the latter was inconsistent with the evidence in the record. He observed Becker's report of activities of daily living to Jones-Thurman included getting on the computer, reading email, performing self-care, cooking, cleaning, running errands and driving. As discussed by Jones-Thurman, Becker was cooperative on mental status testing and his cognitive functions were "generally intact," with a GAF of 50. (*Id.*) Dr. Quinn gave "great weight" to Jones'-Thurman's opinions that Becker would be able to remember and understand information and carry

out tasks, that he was unwilling to take any medication or participate in therapy, had difficulties interacting and might have some difficulty using fair judgment and responding to change appropriately. (*Id.*) Dr. Quinn also noted Becker had reportedhe completed basic activities of daily living, had interpersonal difficulties, followed written instructions pretty well but had difficulties with spoken instructions, and had difficulties handling stress or change. (*Id.* at 81). Dr. Quinn found a third party report (from Becker's mother) was consistent with Becker's and that the allegations were "mostly credible," except for Becker's "misreport" of his marijuana use patterns. (*Id.*) Dr. Quinn concluded Becker was

> able to complete simple, repetitive to moderately complex tasks in a sustained manner, while he will have difficulties following maintaining interpersonal functioning, handling change and using good judgment. . . . the claimant does have intermittent care for mental health issues, while he continues to report depression/anxiety. Despite his report of continued symptoms, the claimant refuses mental health care. Functionally, the evidence show (sic) that the claimant is able to complete basic ADLs, he can interact adequately superficially as he does so throughout the evidence, and the claimant's cognitive functions are intact for most tasks based on mental status performances and the examining psychologist's opinions.

(*Id.*)

On reconsideration on July 9, 2014 (AR at 85-96), David Christiansen, Ph.D., reviewed the same materials as Dr. Quinn, plus an evaluation performed by Amy Riessland, LSW, on July 3, 2014 (*Id.* at 356, 8F) and additional records from Myrtue Medical Clinic (*Id.* at 342-351, 7F). Dr. Christiansen noted that per the records, Becker had been receiving treatment with the medication Clonazepam and had been showing some improvement in his function. Specifically, records indicated that when seen by his treating source in April 2014 Becker was more interactive, was actively looking for a job, and answered questions without getting upset. (*Id.* at 94). Dr. Christiansen reviewed the report from Ms. Riessland in which she observed Becker was "disengaged in the conversation," was obsessing about his future and felt depressed and hopeless.

Dr. Christiansen noted there was no mention of medication in the report and he did not give the assessment much weight as it was based on a one time meeting. (*Id.*) Dr. Christiansen also noted that there were some inconsistencies in the medical records as Becker did not want to take medication as nothing would help him, yet the records indicated he was "much improved" with medication. (*Id.*) Dr. Christiansen confirmed Becker should be capable as indicated by Dr. Quinn. (*Id.*)

### D. Hearing Testimony

At the hearing on November 9, 2015, Becker's counsel amended the onset date to February 1, 2014. (AR at 32). Becker testified first. He was 20 years old at the time of hearing. (*Id.* at 34). His last job was at Taco John's for about a week after he had left high school. (*Id.* at 34-35). He left that job as it was too overwhelming – he could not talk to people at the cash register and he could not get "the hang of cooking" or the cash register. (*Id.* at 35). He did not think he could just clean up the dining area of a Taco John's as he felt uncomfortable in public places thinking that people were looking at him. (*Id.* at 36). He also performed a housekeeping job at a small hotel in Shelby during the summer. (*Id.*) It was not full-time employment and ended because he could not knock on doors and talk to people staying there. (*Id.* at 37). Becker would remember what needed to be done if he had a job like cleaning up the dining area at Taco John's. (*Id.* at 38-39). He had not tried to find a job since working for Taco John's in 2012. (*Id.* at 39).

Becker could drive a car, sometimes skateboarded around his house and might go for a walk with friends. (AR at 39). He described his activities the previous day, which include looking for his cellphone which his girlfriend lost. They drove to her brother's house in Avoca, then went to the Henry Doorly Zoo. (*Id.* at 40-41). They spent a couple of hours at the zoo, then went home where he argued with his girlfriend and then his mom. (*Id.* at 41). His girlfriend lived with Becker

and his parents. He met her a year before the hearing and she had been living there after she got kicked out of her brother's house. (*Id.* at 41-42). Becker said he might walk on a trail with his girlfriend or take her to her brother's house so she could see her niece and nephew. (*Id.* at 42).

Becker testified he was trying to push himself to do more things and go out and talk to more people but it just made it worse; he would get overwhelmed and panic. (AR at 42). A month before the hearing he moved to Pennsylvania with his girlfriend to live with a friend but it did not work. (*Id.* at 42-43). Becker drove to Pennsylvania, but returned to Nebraska for the hearing. (*Id.* at 44). He was living with his parents. (*Id.*) Becker testified he did dishes every day, cooked and cleaned house, and would do laundry. (*Id.*) The ALJ asked Becker about his attempt to make candles and sell them. (*Id.* at 45). Becker testified he could not work in a factory just filling molds because it would terrify him to talk to people when he was clocking in. (*Id.*) He did not think he could overcome the "uncomfortable feeling" even if he had no other place to live. (*Id.* at 46).

In terms of other things he was trying to get better, Becker stopped seeing a psychologist or counselor because none of them helped him in the past. (AR at 46). None of the therapy suggestions worked. (*Id.* at 47). He last had a panic attack within the last couple of weeks which got triggered by a bad day with his girlfriend. (*Id.*) He did see Mr. Pucelik the last month and had been seeing him after he returned from Pennsylvania. (*Id.*) Becker was taking medication, although he did not think it was going to help with his problem. He took Clonazepam as prescribed and Mr. Pucelik knew Becker did not think it was helping. (*Id.* at 48-49). Becker did not want to switch to a different medication because he has taken so many different things. (*Id.* at 49).

On examination by his attorney, Becker said it was hard for him to find a job as he got nervous just pulling up to a place to get an application. (AR at 50). His depression was not as bad as it used to be. (*Id.*) He might have crying spells once or twice a week lasting ten minutes to a

half-hour depending on the situation. (*Id.* at 50-51). In terms of his ability to concentrate and stay on task, Becker said he could be doing something, then see something else that needed to be done and would stop to do that, not finishing the first task. (*Id.* at 51). His suicidal thoughts were under control. (*Id.*)  He occasionally avoided even his parents and girlfriend. (*Id.*) He testified he had a lot of problems with anger and might snap when people did not understand him. (*Id.* at 51-52). Becker said he could be difficult to get along with, even with loved ones. (*Id.* at 52).   When interacting with other people, Becker testified he did not look people in the eye and tried to avoid them, unless it was someone he knew or someone he was buying something from. (*Id.*) He thought his condition was getting worse. He had been treating with Mr. Pucelik at Myrtue Clinic for a few years, seeing him once a month, then once every two months. (*Id.* at 52-53).

The ALJ asked additional questions about Becker's residence with his girlfriend in Omaha, which Becker said lasted a month or two but did not work out. (AR at 53). His girlfriend had a part-time job at Embers in Avoca. (*Id.* at 53-54). Becker testified he would go to the restaurant and talk to her and would drive her to work. (*Id.* at 54). Becker said he no longer used marijuana and stopped a few years before; he did not drink alcohol. (*Id.*)

Becker's mother, Christine Becker, testified concerning her observations of her son. (AR at 56). She testified he had panic attacks very often, for unknown reasons. (*Id.*) During a panic attack her son would have trouble breathing, would sweat, his hands would shake and he became "almost nonsensical." (*Id.*) It sometimes came out as rage, never physical, but "very verbal, very loud." (*Id.*) Often at the end of the panic attack he would end up sobbing. (*Id.* at 57). He would call her at work when he had an attack and she has feared he would hyperventilate and lose consciousness. (*Id.*) Ms. Becker testified his attacks occurred twice a week, maybe more and stress

would prompt an attack. (*Id.* at 58). In terms of Becker's ability to socialize and communicate with people, Ms. Becker reported that Becker was uncomfortable around his brother's family. (*Id.*)

In response to questions by the ALJ, Ms. Becker testified regarding a lawn mowing job hypothetical, that she did not know if Becker could get the job in the first place and if something unexpected came up she did not know if he could handle the situation. (AR at 59-60). She testified they had thought about vocational rehabilitation but it would require him to go in and speak to someone, which he has in the past been unable to do. (*Id.* at 60-61).

In response to further questions by counsel, Ms. Becker testified Becker had good and bad days: on good days no one would know there was anything wrong; on bad days he woke up mad and nothing went right the whole day. (AR at 61-62). On bad days Ms. Becker said he would retreat to his safe place, his room or to things that he knows. (*Id.* at 62). She did not believe he could make it to a job on bad days, which she estimated happened once or twice a week. (*Id.*) Prior to the hearing he was stressed and he had wisdom teeth removed prior to the hearing and it was also a cause of stress. (*Id.*)

The ALJ asked Ms. Becker if Becker could do chores around the house on bad days, to which she responded he could if he could stay focused long enough. (AR at 62-63). She thought he could only do a couple of items and would be distracted or lose interest. (*Id.* at 63). Ms. Becker testified the zoo was a good place for him to go because he loved animals and there was room to spread out. (*Id.* at 64). He went to Pennsylvania to try something new but after a couple of months his phone calls to his mother were more and he needed to come home. (*Id.* at 64-65). She thought he could live independently although he might call his family to find out how to get utilities hooked up and the like. (*Id.* at 65). He could buy groceries, cook, do laundry, and do his personal care. (*Id.*)

Finally, the vocational expert, Stephen Schill, was examined. (AR at 66). In response to the ALJ's hypothetical of a worker with no past relevant work who could do simple and repetitive work which did not require the use of independent judgment, who could respond to routine changes in the work environment, could perform work activity which did not require more than brief, superficial and incidental interaction with the public, could perform job tasks that did not require coordination with coworkers, Mr. Schill said there would jobs, such as kitchen helper, laundry room worker, or cleaner. (*Id.* at 66-67). In response to Becker's attorney's question how missing three days of work per month would affect his opinion, Mr. Schill testified the individual would not be able to perform the jobs mentioned. (*Id.* at 68). If the individual was not capable of working at a competitive pace for 25 percent of the work day, Mr. Schill said the individual would not be able to perform the jobs. (*Id.*) Finally, if the individual could not complete a workday or workweek without experiencing "work disruptive psychological symptomology, anger, inappropriate interaction, panic attacks, need to isolate" which would cause the individual to off-task 20 percent of the time, Mr. Schill testified the individual would not be able to perform the positions mentioned. (*Id.*)

The ALJ concluded with questions to Becker about an assessment by a social worker Amy Riessland. (AR at 69). Becker did not recall seeing her. (*Id.*)

## II.      FINDINGS OF THE COMMISSIONER

In order to qualify for benefits under the Act, Becker must have been disabled. "Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner uses the following five-step evaluation to determine whether

a claimant is disabled within the meaning of the Act and therefore eligible for disability benefits: "whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Byes v. Astrue*, 687 F.3d 913, 915 n.2 (8th Cir. 2012)(quoting *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009)). If at step (4) the ALJ makes a finding that a claimant is unable to perform his/her past relevant work, the burden shifts to the Commissioner to prove with medical evidence the claimant "has a residual functional capacity to do other kinds of work, and that other work exists in significant numbers that [claimant] can perform." *Nalley v. Apfel*, 100 F. Supp. 2d 947, 952-53 (S.D. Iowa 2000)(citing cases).

Following the requisite five-step evaluation, the ALJ issued the written decision at issue in this case on December 18, 2015 and made the following findings:

1. The claimant has not engaged in substantial gainful activity since February 10, 2014, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: mood disorder, attention deficit hyperactivity disorder (ADHD), and anxiety disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is able to perform only work that is simple and repetitive; does not require the use of independent judgment; does not require more than brief, superficial, and incidental interaction with the public; and does not require working in tandem, in close coordination, or as a partner with co-workers. The claimant is able to respond to routine changes in a work environment.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on March 7, 1995 and was 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, a defined in the Social Security Act, since February 10, 2014, the date the application was filed (20 CFR 416.920(g)).

(AR at 15-21).

## III.    STANDARD OF REVIEW

This Court "will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)(quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)); *see also Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013); *Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013); 42 U.S.C. § 405(g)("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. To determine whether substantial evidence supports the decision, we must consider evidence that both supports and detracts from the decision. If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently.

*Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010)(internal citations and quotation marks omitted); *see Phillips v. Colvin*, 721 F.3d 632, 625 (8th Cir. 2013); *Kamann*, 721 F.3d at 950; *Young*, 702 F.3d at 491. The Court should not overturn the ALJ's decision as long as the decision "falls within the available zone of choice." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009)(quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "The ALJ's decision 'is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.'" *Heino v. Astrue*, 578 F.3d at 879 (quoting *Bradley*, 528 F.3d at 1115); *see Buckner*, 646 F.3d at 556. If two inconsistent positions may be drawn from the evidence and one of those positions represents the agency's findings, the decision must be affirmed. *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017).

## IV.    DISCUSSION

Plaintiff raises four challenges to the ALJ's determination: (1) that the ALJ erred in failing to find social anxiety disorder to be a severe impairment; (2) the ALJ's RFC is not supported by substantial evidence based on the record as a whole; (3) the ALJ submitted an inaccurate hypothetical to the vocational expert; thus the testimony by the vocational expert is not substantial evidence upon which the ALJ could rely; and (4) the ALJ's credibility assessments are not supported by substantial evidence. Defendant responds: (1) substantial evidence supports the ALJ's Step Two finding omitting social anxiety disorder as a severe impairment and even if it should have been included, the ALJ found other severe impairments and proceeded to Step Five; (2) substantial evidence supports the ALJ's RFC finding; (3) the ALJ's reliance on VE testimony at Step Five was proper; and (4) substantial evidence supports the ALJ's credibility finding.

A.      Social Anxiety Disorder

At Step Two of the sequential analysis, the ALJ found that Becker had "the following severe impairments: mood disorder, attention deficit hyperactivity disorder (ADHD), and anxiety disorder." (AR at 15). Plaintiff complains the ALJ "failed to find social anxiety disorder to be a severe impairment." (Pl. Brief [14] at 6). Preliminarily, the Court observes that in discussing his findings, the ALJ noted that Becker had "been diagnosed with several anxiety related disorders . . . ." and referred to a medical record which included generalized anxiety disorder and social anxiety disorder as diagnoses. (AR at 15, citing AR at 340 (6F/5)). The Court believes "social anxiety disorder" was included in the ALJ's Step Two Findings in which he found that Becker's anxiety disorder was severe. If that is the case, the ALJ did not fail to include plaintiff's "social anxiety disorder" as a severe impairment.

Even if Becker's "social anxiety disorder" was not found to be severe, as defendant points out, the ALJ found other mental health impairments were severe and did not terminate his sequential analysis at Step Two but continued through the entire analysis. The ALJ did not deny or fail to acknowledge the severe nature of Becker's social anxiety disorder; rather, he found Becker's "statements concerning the intensity, persistence and limiting effects" of his disorder were not "entirely credible," a separate issue discussed *infra* in this opinion. The ALJ specifically discussed Becker's social anxiety disorder at some length and provided accommodation for that disorder in his RFC by limiting him to work activities "that require no more than brief, superficial, and incidental interactions with the public and that do not involve working in tandem, in close coordination, or as a partner with co-workers." (AR at 18-19). Any potential error with respect to Becker's social anxiety disorder at Step Two was harmless. *See Faint v. Colvin*, 26 F. Supp. 3d 896, 910 (E.D. Mo. 2014)("Where an ALJ errs by failing to find an impairment to be severe, such

error is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process"); *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010).

B.      RFC

The ALJ found Becker had the RFC

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is able to perform only work that is simple and repetitive; does not require the use of independent judgment; does not require more than brief, superficial, and incidental interaction with the public; and does not require working in tandem, in close coordination, or as a partner with co-workers. The claimant is able to respond to routine changes in a work environment.

(AR at 17). Plaintiff's main complaint with respect to this finding is that the ALJ relied "almost exclusively" on the conclusions of the state agency consultants who conducted only a paper review of records and erroneously discounted opinions concerning the limitations flowing from Becker's social anxiety disorder offered by the other mental health providers and experts who had actual contact with Becker. (Pl. Brief [14] at 8-13). Defendant responds the ALJ properly evaluated the opinion evidence in making the RFC determination and articulated sufficient reasons for the weight he gave the various opinions. (Def. Brief. [15] at 8-19).

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Steed v. Astrue,* 524 F.3d 872, 875 (8th Cir. 2008) (quoting *Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007)).

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. . . . A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)(citing *Ghant v. Bowen,* 930 F.2d 633, 639 (8th Cir. 1991) and *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)). Generally, the opinion of a consulting physician who has examined the claimant only once or only reviewed records is not substantial evidence, nor is the testimony of a vocational expert based on that evidence. *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003); *Singh*, 222 F.3d at 452 (quoting *Kelley*, 133 F.3d at 589 and citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)).

In reaching the RFC determination in this case, the ALJ made specific findings with respect to the medical opinions given, in conjunction with Becker's reports of his activities to those providers, his self-report of functions and his mother's third-party function report.

1.     <u>Dr. Rosanna Jones-Thurman, Ph.D.</u>

The ALJ found that Dr. Jones-Thurman's diagnosis opinions following her consultative examination were consistent with Becker's treatment history. (AR at 21). With respect to her conclusions concerning Becker's functional abilities, however, the ALJ gave only some weight. (*Id.*) Specifically, Dr. Jones-Thurman concluded he "might have some difficulty using fair judgment and responding appropriately to changes in the work place. The examiner also imagines that he would probably have some difficulty getting along with others . . . ." (*Id.* at 340). The ALJ found the "overall evidence of record, including reports from the claimant and his mother," suggested he was "capable of responding to routine changes in the work environment," citing to the function reports submitted by Becker and his mother (*id.* at 196-213) and Mr. Pucelik's September 29, 2015 letter to counsel (*id.* at 363) in which he noted that Becker had reported being able to work through problems adjusting to living in Pennsylvania and Omaha with his girlfriend. (*Id.* at 21). The ALJ also found Dr. Jones-Thurman's opinion that Becker would have "difficulty" was "of little use in determining his residual functional capacity since she does not say that he has

difficulty but could overcome [it] or whether it is [s]o difficult[] that he fails despite his best efforts." (*Id.*)

Plaintiff argues the records the ALJ cited in support of his criticisms of Dr. Jones-Thurman's opinions do not support his position and noted that the "paper review psychologist" gave "great weight" to her opinions. (Pl. Brief [14] at 8-9). Defendant responds the weight the ALJ gave Dr. Jones-Thurman's opinion was proper.

Becker's mother indicated in her written third party function report that with respect to changes in routine, he "does okay if he gets warning of the change." (AR at 202). In response to the same question Becker wrote "small changes are okay; big changes it's harder." (*Id.* at 212). A month before the hearing with the ALJ, Becker testified he traveled to Pennsylvania with his girlfriend and returned to Nebraska for the hearing. (*Id.* at 44). Mr. Pucelik also referenced Becker's travel to Pennsylvania in a positive light. (*Id.* at 363). Thus, there was evidence in the record which was inconsistent with Dr. Jones-Thurman's opinion regarding Becker's ability to handle change which the ALJ properly took into account in giving less weight to her opinion. *See Julin v. Colvin*, 826 F.3d 1082, 1089 (8th Cir. 2016)(ALJ did not reject opinions of treating physician entirely in determining RFC).

As for Dr. Jones-Thurman's opinion that Becker would have "difficulty" working with others and adapting to changes in the workplace, the ALJ properly found such an opinion was "of little use" as Dr. Jones-Thurman did not explain what she meant by "difficulty." *See Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996)(ALJ could limit the value of a physician's opinion because it was vague and/or conclusory). Furthermore, although not given as a reason for placing less weight on Dr. Jones-Thurman's opinions, she did see Becker on only one occasion for consultative examination. She was not a treating physician. *See Singh*, 222 F.3d at 452 and

*Wakefield v. Colvin*, 171 F. Supp. 2d 857, 867 (S.D. Iowa 2016)(both quoting *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir.1998)): "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.").

In spite of the lesser weight the ALJ placed on Dr. Jones-Thurman's opinions, he did include limitations in the RFC addressing working with others and independent judgment. (AR at 17). The ALJ's consideration of Dr. Jones-Thurman's opinions in determining Becker's RFC was proper and substantially supported in the record and the law.

2.      Patrick Pucelik, ARNP

In the first of two opinions, Mr. Pucelik gave the opinion that although Becker was stable, he should be considered for disability as he would not be "able to hold or maintain a job given the amount of anxiety he has when in a public setting." (AR at 362). In a second statement about four months later, Mr. Pucelik gave the opinion Becker was "disabled by his social anxiety, general anxiety and general depression" but hopeful that he could "work with these disabilities and obtain employment," although not at the time of his report. (*Id.* at 363).

Mr. Pucelik was a treating source, however, the ALJ gave his opinions "only little weight" because (1) he was not a mental health specialist; (2) he was not an acceptable medical source; (3) he did not explain the evidence he relied upon in forming his opinions; (4) his treatment notes did not contain "the type of significant clinical observations one would expect if the claimant were in fact as limited as opined," and (5) his opinion that Becker was disabled was a legal conclusion which is reserved for the Commissioner. (AR at 20). Plaintiff criticizes the ALJ's findings as beginning a "pattern of discounting or ignoring the opinions of every medical authority who has seen" Becker, the conclusions ignored Mr. Pucelik's qualifications as an "other source," and the ALJ failed "to understand the purpose and significance of treating notes" which plaintiff argues

"never address a patient's limitations or ability to function." (Pl. Brief [14] at 10-11). Defendant responds the ALJ properly considered Mr. Pucelik's opinions.

With respect to the ALJ's first reason, there is evidence in the record that Mr. Pucelik unsuccessfully tried to refer Becker to "someone" as Becker was "more complicated than I am trained to handle and would be better served by therapist and psychiatry." (AR at 324). With respect to the ALJ's second reason to discount Mr. Pucelik's opinions, a licensed advanced practice registered nurse is now listed as an acceptable medical source, but only for claims filed on or after March 27, 2017. 20 C.F.R. § 416.902(a)(7). The ALJ made his finding under the prior applicable regulation, 20 C.F.R. § 416.913(a) (version effective September 3, 2013 through March 26, 2017). At the time of the ALJ's decision on December 18, 2015, Mr. Pucelik clearly would not have been acceptable medical source. As for the third reason, Mr. Pucelik's lack of explanation of evidence relied on, in a checkbox questionnaire accompanying his September 29, 2015 opinion letter, when asked about the "medical/clinical findings" that supported his assessments of Becker's mental abilities and aptitudes needed to do unskilled work that fell in the "poor" category, Mr. Pucelik only noted "his limitations are related to anxiety associated with being around others." (*Id.* at 366). The regulations explain "The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion," 20 C.F.R. § 416.927(c)(3). As for the fifth reason, that opinions concerning disability are reserved for the Commissioner, this finding also is supported by the regulations. 20 C.F.R. § 416.927(d); *Sammons v. Astrue*, 497 F.3d 813, 819 (8th Cir. 2007).

With respect to the ALJ's fourth reason for discounting Mr. Pucelik's opinions, that his treatment notes did not support them, the ALJ noted that since the amended onset date of February 2, 2014, Becker reported to Mr. Pucelik he was "doing well" or "getting along well" (AR at 327,

328, 351, 379, 382, 383, 385, 386, 387). On other occasions Mr. Pucelik noted Becker was "more interactive" (*id.* at 350, 379, 386) and "actively looking for a job," (*id.* at 350), was "stable on his current meds" (*id.* at 351); was "pleasant and cooperative" with good hygiene. (*Id.* at 387). The ALJ properly discounted Mr. Pucelik's opinions when compared with his treatment notes. *See Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010)(treating source's opinions were inconsistent with treatment notes).

The ALJ's consideration of Mr. Pucelik's opinions in determining Becker's RFC was proper and substantially supported in the record and the law.

### 3. Amy Riessland, LSW

Ms. Riessland saw Becker on one occasion on July 1, 2014. (AR at 356). She conducted an intake interview with Becker and his mother but it does not appear she conducted a mental status examination or reviewed any past records. Based on the intake interview, Ms. Riessland gave the opinion that Becker "would struggle to carry out instructions, maintain attention, concentration and pace . . . would struggle to interact appropriately with supervisors, co-workers and especially the public due to the extreme social anxiety that he reports." (*Id.*) The ALJ gave Ms. Riessland's opinions "only some weight" because (1) she had only one examination of Becker; (2) "they appear to be premised largely on the claimant's subjective complaints;" (3) there was no clarification whether Becker "struggles and succeeds or struggles and fails in those areas where she thinks he 'struggles'"; (4) Becker and his mother admitted he could handle some change; (5) Becker testified he only had "occasional problems with concentration and attention;" and (6) Ms. Riessland was not an acceptable medical source. Plaintiff characterizes the ALJ's reasons as an "attack" on Ms. Riessland's opinions and complains about "the ALJ's willingness to rely almost

exclusively on the opinions of a paper review expert who has never seen plaintiff." (Pl. Brief [14] at 11).

Taking the last reason first, the ALJ properly noted that Ms. Riessland was not an acceptable medical source as set out in 20 C.F.R. § 416.913(a) (version effective September 3, 2013 through March 26, 2017) as licensed social worker does not fall within any of the approved categories. Plaintiff complains the ALJ failed to note Ms. Riessland might qualify as an appropriate "other source" or that her opinion was uniform with those of Mr. Pucelik, Dr. Jones-Thurman and Dr. Doyle. It is not the case that the ALJ totally disregarded Ms. Riessland's opinions, or for that matter, the opinions of Mr. Pucelik, Dr. Jones-Thurman and Dr. Doyle, only determined the weight to be given them. He specifically found records from Becker's 2011 hospitalization corroborated Ms. Riessland's opinion Becker had limited judgment and the RFC accounts for that finding by including as a nonexertional limitation work that does not require independent judgment.

The ALJ's first discounting reason concerning the fact Ms. Riessland conducted only a single examination of Becker is supported by 20 C.F.R. § 416.927(c)(1)(i) (one of the factors in deciding the weight to give a medical source's opinions is the "[l]ength of the treatment relationship and the frequency of examination); *see Chesser*, 858 F.3d at 1164 (assignment of little weight to opinion of one-time examiner was not error).

The second finding that Ms. Riessland's opinions were "largely" based on Becker's subjective complaints finds support in her report, where Ms. Riessland stated her opinion concerning his abilities "to carry out instructions, maintain attention, concentration and pace" was "[b]ased on the intake information," based her opinion about Becker's ability to interact appropriately with others on his report concerning his extreme social anxiety and resulting verbal

aggression, and her opinion about Becker's ability to respond to workplace changes on his "report[]
to have extreme anxiety to any change." (AR at 356).

The third finding regarding the lack of clarity of Ms. Riessland's findings concerning
Becker's "struggles" also was proper. *See Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir.
2014)(opinion consisting of "vague, conclusory statements" could be discounted, quoting *Wildman
v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.
1996)(noting conclusory opinions were properly discounted by the ALJ).

As to the fourth and fifth findings concerning inconsistent evidence in the record compared
to Ms. Riessland's opinions, Ms. Riessland thought Becker would "struggle to carry out
instructions, maintain attention, concentration and pace." (AR at 356) As noted previously there is
evidence that Becker himself stated he handled "small changes 'okay'" and his mother stated that
he could handle changes with warning. (*Id.* at 202, 212). Additionally, at hearing Becker testified
that "[s]ometimes" and at "certain times" it was hard to concentrate on a task but he could
remember how to clean the dining room at the fast food restaurant where he had worked. (*Id.* at
38-39, 51). In his written function report, Becker stated he could finish what he started and
followed written instructions "pretty well." (*Id.* at 211).

Overall, the record supports the ALJ's reasons for giving Ms. Riessland's opinion only
"some weight."

4.      Beverly A. Doyle, Ph.D.

After a consultative examination Dr. Doyle gave the opinion that due to his major
depressive disorder and panic disorder Becker would be "unable to complete his education, work
and live independently. He is unable to manage his funds and engage in daily activities including
housekeeping, shopping and cooking." (AR at 393). She completed a checkbox questionnaire

concerning Becker's functional abilities, rating him at "poor to no ability" in many basic mental abilities and aptitudes needed for unskilled work. (*Id.* at 399-400). She also noted he had "extreme" episodes of deterioration or decompensation in work or work-like settings. (*Id.* at 402).

The ALJ gave Dr. Doyle's opinions "little weight" because (1) they were based on a single examination; (2) they "appear[ed] to be premised largely on the claimant's subjective complaints;" (3) there were internal inconsistencies as Dr. Doyle stated Becker could and could not manage his own benefits; (4) her opinions were inconsistent with Becker's report of his activities of daily living; and (5) Dr. Doyle's examination was at the request of Becker's attorney in "the context of obtaining benefits, . . . and in an effort to generate evidence for the current appeal, which gave the claimant no motivation to provide an objective, unbiased, and complete presentation." (AR at 20). Plaintiff's main criticisms of the ALJ's reasons are that the ALJ discounted the report because only a single examination was conducted yet relied on a "paper review expert;" that the alleged inconsistent daily activities "reflect a level of activity possible only in a controlled environment and in no way reflect the capacity to" work; and that the suggestion Becker saw Dr. Doyle with the "exclusive purpose of obtaining benefits" is "unsupported and indefensible." (Pl. Brief [14] at 12).

Again, the ALJ's first discounting reason concerning the fact Dr. Doyle conducted only a single examination of Becker is supported by 20 C.F.R. § 416.927(c)(1)(i) and *Chesser*. Also, as with Ms. Riessland's opinions, the ALJ's discount concerning Dr. Doyle's apparent reliance on Becker's subjective complaints has a basis in comments made in Dr. Doyle's report that Becker told her "he had mental health problems that include feeling sad, and having panic attacks," which he said occurred twice a week from which Dr. Doyle concluded that his mental health disorder "cause[d] him to be unable to complete his education, work and live independently" and rendered

him "unable to manage his funds and engage in daily activities including housekeeping, shopping and cooking." (AR at 393). Dr. Doyle's report also was internally inconsistent, as noted by the ALJ, as she first opined Becker could not manage funds (*id.*) but in the questionnaire concerning his functional capacity said he could (*id.* at 403). Internal inconsistencies in a medical opinion support the ALJ giving less weight to the opinion. *Chesser*, 858 F.3d at 1164.

There is also evidence in the record that is completely inconsistent with Dr. Doyle's opinions regarding Becker's ability to engage in the activities of daily living, for example, Becker testified at hearing that while living with his parents he did dishes every day, cooked and cleaned house, and would do laundry. (AR at 44). In his written function report, Becker stated he performed pet chores for his cat, prepared meals and did laundry and dishes daily, and mowed. (*Id.* at 207-208). Becker also drove a car and would go to the gas station, post office, bank (*id.* at 210) and testified at hearing he went to the zoo, drove his girlfriend to her brother's house, and traveled with her to Pennsylvania. (*Id.* at 41-43). An ALJ does not have to ignore an inconsistency between a doctor's limitations and what the patient actually does in daily living. *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017)(plaintiff's daily activities of fishing and dog training were inconsistent with doctor's opinion concerning plaintiff's limitations); *Toland*, 761 F.3d at 936 (plaintiff's self-reported activities "undermine[d]" the doctor's opinion).

Finally, with respect to the ALJ's observation that Dr. Doyle's report at the request of counsel arose in the context of obtaining benefits, while it is true as plaintiff argues that plaintiff has the burden to prove his case with medical evidence, the ALJ's observation is supported by the regulations and case law. *See* 20 C.F.R. § 416.902 ("We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of

your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source."); *Mess v. Colvin*, No. C15-1013-LRR, 2016 WL 2858532, at *6 (N.D. Iowa 5/16/2016)("The ALJ may properly discount an opinion where the limitations listed on the form were never mentioned in treatment records, nor supported by any objective testing or reasoning, or when they were made for purposes of supporting a claim for benefits rather than in the course of treatment.").

Overall, the record supports the ALJ's reasons given for according Dr. Doyle's opinion "little weight."

5.    <u>State Agency Reports</u>

The first state agency psychological expert, Dr. Aaron Quinn, Ph.D., had access to Becker's records which pre-dated May 20, 2014, the date of Dr. Quinn's report, which included Dr. Jones-Thurman's evaluation and some of Mr. Pucelik's records, as well as the function reports by Becker and his mother.  (AR at 74-76). After reviewing the records and summarizing them, Dr. Quinn rendered the opinion that Becker could perform basic activities of daily living, could interact adequately superficially and his cognitive functions were "intact for most tasks based on mental status performances and the examining psychologist's opinions." (*Id.* at 81). On reconsideration review, Dr. David Christiansen, Ph.D., reviewed the same records and some additional records pre-dating his July 9, 2014 report, concluding Becker should be capable as Dr. Quinn had previously indicated. (*Id.* at 86-88, 93-94). The ALJ gave "weight" to their opinions and noted his RFC was essentially the same as their conclusions. (*Id.* at 21).

Plaintiff argues that the ALJ's reliance on a "paper review expert" has not met with the Eighth Circuit's approval, citing *Nevlan v. Apfel*, 208 F.3d 853, 857 (8th Cir. 2000)(an ALJ's reliance on "the RFC determination of a non-treating, non-examining physician . . . does not satisfy

his duty to fully and fairly develop the record.") (Pl. Brief [14] at 13). In response, defendant notes that an ALJ is required to consider state agency expert findings:

> 1. Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review.
> 2. Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.

SSR 96-6p, 1996 WL 374180.

The state agency experts' opinions accurately summarized the evidence in the treatment notes that Becker was "doing well" or "getting along well." (*See* AR at 327-28, 351, 379, 381-82, 387). They noted Becker had reported improvements with medication and did not want mental health referrals, all of which is supported in the medical records. (*Id.* at 80, 93-94; *see* 323, 325, 326, 381, 382, 384). The state agency experts gave Dr. Jones-Thurman's opinions great weight (*id.* at 80, 93), the ALJ did not. In fact, the ALJ gave the state agency expert opinions only "weight," not "great weight" and considered and weighed their opinions with the others, as was his function. *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012)(the ALJ resolved conflicts among medical opinions).

In summary, the ALJ properly evaluated all the opinion evidence in the record in making his RFC determination and gave sufficient reasons for the weight he gave those opinions. There was substantial evidence to support the RFC determination.

C.      Hypothetical

Plaintiff argues that the RFC finding incorporated in the hypothetical to the VE was not supported by substantial evidence; thus the VE's testimony was not substantial evidence upon which the VE could rely.  Given the Court's finding that there was substantial evidence to support

the RFC, the VE's testimony response to the hypothetical question which incorporated the RFC was substantial evidence upon which the ALJ could rely in finding Becker could perform work which existed in significant numbers in the national economy. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)(hypothetical based on RFC which had support in the record was "properly framed" and the ALJ could rely on the VE's responsive testimony).

D.     Credibility

Finally, plaintiff argues the ALJ's credibility assessments were not supported by substantial evidence. (Pl. Brief [14] at 15).

In considering the credibility of a claimant's subjective allegations of pain, an ALJ must apply the factors in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Wildman,* 596 F.3d at 968; SSR 96-7p. Those factors include:

> (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions.

*Wildman*, 596 F.3d at 968 (quoting *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001)). "Other factors include the claimant's 'relevant work history and the absence of objective medical evidence to support the complaints.'" *Id.* (quoting *Gowell*, 242 F.3d at 796). "The ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). So long "'as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so,'" courts are to defer to the ALJ's credibility finding. *Wildman*, 596 F.3d at 968 (quoting *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007)(internal quotation omitted)); *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011).

The ALJ gave three reasons why Becker's statements "concerning the intensity, persistence and limiting effects of" his symptoms were not entirely credible. (AR at 18-19). First, Becker

alleged his social anxiety was debilitating but told his treatment provider at nine out of eleven appointments he was "doing well" or "getting along well," (AR at 327, 328, 351, 379, 382, 383, 385, 386, 387), never reported panic attacks which he and his mother testified were frequent, and told Mr. Pucelik he was able to "work through" anxiety when he moved to Pennsylvania and then to Omaha, but testified at hearing that while in Pennsylvania he panicked when he tried to donate plasma. (*Id.* at 42-43). The ALJ found these discrepancies coupled with other facts suggested Becker was "not entirely credible with regard to his subjective presentation of symptoms and other limitations." (*Id.* at 18).

The second reason given by the ALJ for finding Becker less than credible was that in spite of alleging he was completely unable to function around other people, including his family, Becker did not take full advantage of the treatment options which were offered to him. The ALJ noted several occasions in the record when Mr. Pucelik attempted to refer Becker to a mental health professional or other treatments but Becker refused. (AR at 323, 324, 381, 384, 385). Becker on one occasion told Mr. Pucelik he "does not want to see anyone or try anything different." (*Id.* at 384). Mr. Pucelik recommended Becker try other medications, but Becker refused. (*Id.* at 324, 381, 382). While Becker testified at hearing he took medication but did not think it was helping and he was not "a really big fan of taking any medication" because he had so many different prescriptions in past, the ALJ noted on many occasions Mr. Pucelik observed Becker had improved while taking medication and Becker told him the medication was working. (*Id.* at 323, 325, 326, 328, 350, 351, 382, 384).

The third reason the ALJ gave for finding Becker less than credible was the limiting effects he alleged were not consistent with the activities in which he engaged. (AR at 19). The ALJ

referenced several activities in the record which required Becker to engage in social interaction or go to a public place such as

> (1) maintaining a romantic relationship; (2) going to the gas station, post office, and bank on a regular basis; (3) shopping at Walmart; (4) visiting his girlfriend at the restaurant where she works; (5) taking walks on a public trail; (6) going to the zoo; (7) visiting with members of his girlfriend's family and (8) playing video games with friends.

(AR at 39-41, 42, 54, 210, 253, 393). Although not specifically referenced by the ALJ in the context of Becker's credibility, there was also evidence he was able to drive to Pennsylvania to live with a friend and drive back to Nebraska. (*Id.* 16-44). He also lived in Omaha for a short time with his girlfriend and her stepfather, but had to leave after his girlfriend's credit got ruined. (*Id.* at 53). The ALJ believed that although the social interaction/public exposure involved in some of the activities was "minimal," that Becker could engage in them suggested he could "overcome his social anxiety when he wants to and that he is capable of functioning in public to a certain degree." (*Id.* at 19).

"When the ALJ sets forth the inconsistencies on which he relies in discrediting Plaintiff's subjective complaints, and those inconsistencies are supported by the record, the ALJ's credibility determination should be affirmed." *Tucker v. Astrue*, No. 10-3525-CV-W-RED-SSA, 2011 WL 7670682, at *2 (W.D. Mo. Dec. 2011)(citing *Eichelberger v. Barnhart,* 390 F.3d 584, 590 (8th Cir. 2004)).  *See also Julin*, 826 F.3d at 1087 (inconsistencies between claimant's "subjective complaints of disabling impairments and evidence concerning her daily living patterns also raised doubts."). The ALJ also properly considered Becker's resistance to suggested treatment. *Julin*, 826 F.3d at 1087. There is substantial evidence in the record to support the ALJ's credibility determination.

## V.    REPORT AND RECOMMENDATION AND ORDER

After a thorough review of the entire record in accordance with the deferential standard of review, the Court concludes that the ALJ's determination that Mr. Becker was not disabled within the meaning of the Act is supported by substantial evidence in the record when viewed as a whole. The decision of the ALJ should be affirmed. The undersigned recommends entry of judgment in favor of the defendant and against plaintiff dismissing the Complaint.

IT IS ORDERED that the parties have until **December 4, 2017** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of plaintiff's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

**IT IS SO ORDERED.**

Dated this 20th day of November, 2017.

Helen C. Adams
Chief U.S. Magistrate Judge